UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------X

LAWRENCE HILSDORF,

                  Plaintiff,

      -against-

COMMISSIONER OF SOCIAL SECURITY,

                  Defendant.
----------------------------------------------------------------X

**MEMORANDUM & ORDER**

**08-CV-5290**

NICHOLAS G. GARAUFIS, United States District Judge.

       Pro se Plaintiff Lawrence Hilsdorf ("Hilsdorf" or "Plaintiff") commenced this action

pursuant to Title II of the Social Security Act ("the Act"), 42 U.S.C. § 405(g), seeking review of

a final determination by the Commissioner ("Commissioner" or "Defendant") of the Social

Security Administration ("SSA") denying his July 14, 2003 application for Social Security

Disability Benefits. (See Compl. (Docket Entry #1).) Both parties have moved for judgment on

the pleadings, pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. Hilsdorf seeks an

order reversing the Commissioner's determination that he is not disabled, and remanding for an

award of benefits or at least for reconsideration of the agency decision. The Commissioner

defends the agency decision and seeks dismissal of the Complaint. For the reasons set forth

below, the court concludes that the administrative law judge ("ALJ") made numerous legal errors

and that the ALJ's decision was not supported by substantial evidence. Plaintiff's motion is

granted in part, and the case is remanded for further administrative proceedings consistent with

this Memorandum and Order.

## I.    BACKGROUND

### A.    Procedural History

Plaintiff first applied for Disability Insurance Benefits on June 9, 1998. He alleged that

he became unable to work on May 14, 1998, due to coronary heart disease resulting in

myocardial ischemia. (Admin. Record ("R.") 153.) The Social Security Administration denied

Plaintiff's application in January 1999. (R. 19.) Following a hearing, the Administrative Law

Judge ("ALJ") issued a decision on June 22, 2000, finding that Plaintiff was not disabled and that

he had a residual functional capacity for sedentary work. (R. 153, 195.) The Appeals Council

denied Plaintiff's request for review. (R. 179.) Plaintiff then filed an action in the United States

District Court for the Eastern District of New York challenging the ALJ's decision. Hilsdorf v.

Barnhart, No. 03-CV-2435 (DGT) (E.D.N.Y. Aug. 3, 2004) ("Hilsdorf I"). In Hilsdorf I, Judge

Trager affirmed the ALJ's decision, finding it to be based on substantial evidence. Id.

On July 14, 2003, while Hilsdorf I was still pending before Judge Trager, Plaintiff filed a

second application for disability benefits, again alleging an onset date of May 14, 1998. (R. 15,

61.) He alleged disability due to heart disease, hypertension, carpal tunnel syndrome, and

rheumatoid arthritis. (R. 17, 51, 75, 180.) Because Plaintiff last met the eligibility requirements

for disability benefits on December 31, 2003, (R. 15, 47, 71, 195), the relevant period for this

second application is June 23, 2000[1] through December 31, 2003.

Plaintiff's second application was initially denied on January 9, 2004. (R. 51.) Plaintiff

filed a request for a hearing on March 15, 2004. (R. 52.) ALJ Seymour Fier presided over the

March 20, 2006 hearing, where Plaintiff was represented by counsel. (R. 257-88.) On June 9,

---

[1] Res judicata bars the Commissioner or this court from reconsidering Plaintiff's disability status during any date covered by his first application. 20 C.F.R. § 404.1457(c)(1). The first application, reviewed in Hilsdorf I, covered May 14, 1998 through June 22, 2000 – the period between the alleged onset date and the date of the ALJ's decision on that application.

2006, ALJ Fier issued a decision finding that Plaintiff was not disabled and had retained the residual functional capacity to perform sedentary work through December 31, 2003. (R. 11-17.) Upon review, the Appeals Council vacated the ALJ's decision and remanded the case for consideration of additional evidence. (R. 195.)

A second hearing was held before ALJ Manuel Cofresi on January 8, 2008. (R. 238.) On March 7, 2008, ALJ Cofresi denied Plaintiff's application. (R. 12.) The ALJ found that Plaintiff retained the residual functional capacity for "sedentary to light" work and was not disabled on or before December 31, 2003. (R. 15-22.) On October 29, 2008, the Appeals Council denied Plaintiff's request to review the decision. (R. 5, 11.) Thereafter, Plaintiff filed this action.

### B. Non-Medical Evidence

Plaintiff Lawrence Hilsdorf was born on June 3, 1956, in Flushing, New York. He joined the New York City Police Department in 1981, and served as a police officer for 17 years, until May 31, 1998. He has been married to his second wife, Maureen Kirk, since 1991. He has six children, five of whom live with him. (R. 57-58.)

Plaintiff began experiencing heart problems in 1995, which eventually led him to apply for disability retirement benefits from the NYPD. (R. 147, 242.) On January 26, 1998, the NYPD Medical Board approved his application. (R. 125-27.) Plaintiff left the force on May 14, 1998. (R. 76, 84, 88.)

Plaintiff filed the disability application which is the subject of this action on July 14, 2003. (R. 57-60.) At that time, Plaintiff claimed to be suffering from heart disease, high blood pressure, and rheumatoid arthritis. (R. 74-83, 87-94.) He complained of difficulty breathing, light-headedness, pain and stiffness in his neck, back, arm, and hip, and numbness in his arms and hands. (R. 74-83.) At that time, cardiologist William J. Tenet, M.D. was treating Plaintiff's

heart problems. (R. 77, 90.) Dr. Tenet prescribed Accupril for Plaintiff's high blood pressure, and Lipitor for his cholesterol. (R. 80, 91.) Another doctor, Dimitrios J. Asters, M.D., was treating Plaintiff's arthritic pain, numbness, and carpal tunnel syndrome. (R. 77, 82, 90.) Dr. Asters prescribed Celebrex for Plaintiff's rheumatoid arthritis. (R. 82, 91.)

Plaintiff also complained of continuous pain, decreased mobility, and difficulty sitting or standing for long periods of time. In a Disability Report dated July 4, 2003, Plaintiff stated that "[t]he daily pain in my legs [and] hips make[s] me limp around most of the day. My mobility has just gotten worse, the pain is continuous. I can't raise my arms over my head without pain and it hurts to sit or stand for any long period of time." (R. 82.) At the hearing before ALJ Cofresi, Plaintiff testified that in 2003 he had to lie down two to three times a day for 30 minutes or so because he was "tired all the time." (R. 243.) Plaintiff claimed he experienced difficulty sitting or standing for more than 30 minutes at a time, and could comfortably lift and carry only up to five or six pounds. (R. 244.)

Plaintiff reported that he took Advil for his pain, along with his other prescription medications. Plaintiff also took Valium because he was "very depressed." (R. 245.) Plaintiff reported that he smoked one pack of cigarettes per day and drank sometimes.

With regard to daily activities, Plaintiff reported that he spent the day reading, watching television, listening to music, and taking a walk. (R. 136.) He also did limited shopping for his medications. He reported that he could walk two to three blocks before having to stop and rest. (R. 244.)

### C. Medical Evidence

#### 1. Evidence Prior to the Relevant Period[2]

On May 8, 1996, Plaintiff was hospitalized at the New York Hospital Medical Center of Queens complaining of shortness of breath and chest pain with radiation down his left arm. (R. 116.) Tests results were within normal limits. (R. 115.) An electrocardiogram ("EKG") revealed normal sinus rhythm and stable pattern, (R. 122), and an echocardiogram showed normal aortic valve, normal left atrium, normal mitral valve, and normal ejection fraction. (R. 121.) Plaintiff was placed on a Heparin drip, and his symptoms improved. He was discharged in stable condition.

On January 26, 1998, the NYPD Medical Board (the "Board") approved Plaintiff's application for Accident Disability Retirement, based on a diagnosis of probable acute myocardial ischemia due to coronary disease. (R. 125-27.) The Board stated that the case was not "a clear cut, open and shut one." (R. 125.) In fact, on June 19, 1995, the Board found that there was no evidence of coronary artery disease and that Plaintiff could perform the full duties of a police officer. (Id.) That finding was based in part on a cardiac catheterization performed in February 1995, which had shown no evidence of coronary disease and that plaintiff's chest pain was quite unlike ischemic angina pectoris; coronary angiograms were within normal limits, as

---

[2] Although res judicata bars reconsideration of Judge Trager's decision denying benefits to Plaintiff for this earlier time period, see 20 C.F.R. §§ 404.957(c), (c)(1), it does not preclude consideration of evidence from the earlier period. Rather, to the extent that such evidence, in combination with later evidence from the relevant period, bears upon Plaintiff's disability status during the relevant period, it must be considered. See Groves v. Apfel, 148 F.3d 809, 810 (7th Cir. 1998) ( ("[A]lthough the final judgment denying that application was res judicata, this did not render evidence submitted in support of the application inadmissible to establish, though only in combination with later evidence, that she had become disabled after the period covered by the first proceeding."); see also Lisa v. Sec'y of Dept. of Health & Human Servs., 940 F.2d 40, 44 (2d Cir. 1991) (noting that medical evidence concerning an applicant's condition after the relevant period is "pertinent evidence" regarding his medical impairments during the relevant period).

were subsequent stress tests. (Id.) A repeat stress test in February 1997, however, revealed two changes: "evidence of an area of septal and anteroseptal reversible ischemia which may indicate an element of ischemia," and "a mild fixed inferior defect which may represent diaphragmatic attenuation artifact versus possible inferior scarring." (R. 126.) The Board discounted the latter finding because it was most likely a diaphragmatic attenuation artifact, but stated that the ischemia was not so easily discounted, despite being inconsistent with the negative angiograms. (Id.) Although the Board ultimately diagnosed Plaintiff with probable acute myocardial ischemia due to coronary disease, it reiterated that this was not "an open and shut case of easily identifiable and recognizable ischemia or infarction." (Id.)

### 2. Evidence During the Relevant Period

#### a. Dr. Tenet's Report

An undated and unsigned disability report from Dr. Tenet reported that the doctor had been treating Plaintiff every six to seven months. (R. 130.) The report listed treating diagnoses of hyperlipidemia and arteriosclerotic heart disease. (Id.) It also noted that Plaintiff was asymptomatic, and had experienced weight gain. (Id.) The report stated that Plaintiff was not experiencing chest pain or anginal equivalent. (R. 131.) The sections of the report relating to Plaintiff's limitations of physical activity – including his capacity to lift, carry, walk, stand, sit, push and pull – were left blank. Besides this partially completed report from Dr. Tenet, the record contains no other medical evidence from Plaintiff's treating physicians during the relevant period.

#### b. Dr. Park's Report

On September 18, 2003, Plaintiff was examined by Soo Park, M.D., an internist for the SSA. (R. 20, 136.) Plaintiff reported a history of hypertension for the preceding eight years, for

which he was taking Accupril, a heart attack in 1995, and high cholesterol, for which he was taking Lipitor. Plaintiff also reported that he felt tired. Dr. Park noted that Plaintiff had "a history of rheumatoid arthritis for the last one year," and that plaintiff was experiencing pain in his neck, back, arm and shoulder. Plaintiff was taking 200 milligrams of Celebrex per day for his arthritis. Dr. Park also reported a history of carpal tunnel syndrome in Plaintiff's left hand, with Dupuytren's contracture. Plaintiff complained of occasional chest pain, which he believed was from spasms, for which he was not taking any medication. Plaintiff reported that he smoked one pack of cigarettes per day and drank sometimes. (Id.) He spent the day watching television, reading, and taking a walk. (Id.)

Upon examination, Plaintiff's blood pressure was 120/70. (R. 136.) He appeared in no acute distress. (Id.) He was able to dress and undress and get on and off the examining table without difficulty. (R. 136-37.) Walking was normal, without a limp. (R. 137.) The heart had a regular rhythm, without murmurs or gallops. (Id.) Plaintiff was able to walk on his tiptoes and heels. (Id.) The lumbar spine had sixty degrees of flexion, twenty degrees of dorsiflexion, and thirty degrees of lateral flexion. (Id.) Plaintiff was able to straight leg raise up to sixty degrees. (Id.) The upper and lower extremities had normal ranges of motion. (Id.) There was no real evidence of rheumatoid nodules. Contraction and hypertrophy of extremities were noted. Plaintiff had full use of both hands and arms in dressing and undressing. (Id.) Finger-hand dexterity was intact. (Id.) There was no clubbing, cyanosis, or edema. (Id.) There was no atrophy, spasm, subluxation, contractures, ankylosis, or instability. (Id.)

Neurologically, Plaintiff was "a bit nervous and depressed." (R. 137.) Deep tendon reflexes were 2+ bilaterally. (Id.) Plaintiff had Dupuytren's contracture of the left ring finger tendon area. (Id.) There was normal range of motion. (Id.)

An EKG was within normal limits, and showed no evidence of acute ischemia or left ventricle hypertrophy. (R. 137, 139-40.) Lawrence S. Liebman, M.D., found that an x-ray of the lumbar spine revealed a transitional L5 vertebral body and moderate lumbar straightening. (R. 138.) A chest x-ray was negative. (Id.)

Dr. Park made the following diagnoses: high blood pressure; a history of rheumatoid arthritis with normal range of motion; carpal tunnel syndrome with Dupuytren's contracture in the left ring finger; and a history of heart attack in the past, with chest pains unlike angina. (R. 137.) He concluded that Plaintiff had "limitations of a mild degree of lifting, bending, walking, standing, and pushing and pulling on arm controls." (Id.) His prognosis was "fair." He recommended Plaintiff receive continual medical care and treatment.

c. State Agency Medical Consultants' Reports

On November 10, 2003, S. M. Siddiqui, M.D., a state agency medical consultant, requested that, in order to assess Plaintiff's functional capacity, an exercise stress test be performed. (R. 143.) The resulting EKG stress test and myocardial perfusion imaging on November 20, 2003 showed no evidence of significant ischemia or infarction. (R. 129.) Plaintiff had a normal exercise capacity for his age. The stress perfusion study showed a mild, diffuse inferior defect, which Joseph Wiesel, M.D., a cardiologist, suggested was due to attenuation.

On January 8, 2004, E. Virgo, M.D., a state agency medical consultant, reviewed the evidence, including the November 20, 2003 stress test, and opined that Plaintiff was able to perform "at least medium work" – that is, he could lift fifty pounds and walk or stand six hours in an eight hour day. (R. 141.) Dr. Virgo stated that the consultative examination did not

support a diagnosis of rheumatoid arthritis, and that the EKG and perfusion studies revealed no evidence of ischemia. (Id.)

On January 9, 2004, R. Arnold, a disability analyst with New York's Disability Determination Services ("DDS"), completed a physical residual functional capacity assessment of Plaintiff. (R. 146-51.) The analyst reported a primary diagnosis of heart disease and a secondary diagnosis of a history of rheumatoid arthritis. The analyst noted that Plaintiff complained of occasional chest pain, as well as back and neck pain, which were consistent with Plaintiff's medically diagnosed impairments. (R. 149.) The analyst was unable to provide an opinion as to Plaintiff's credibility as to these subjective complaints, however, because Plaintiff had not offered specific limitations. (Id.)

The analyst estimated that Plaintiff could lift, carry, push and pull up to fifty pounds occasionally and up to twenty-five pounds frequently, and could stand, walk, and/or sit for a total of six hours in an eight hour day. (R. 147.) The analyst found no postural, manipulative, visual, communicative, or environmental limitations. (R. 148-49.)

The analyst was unable to provide an assessment of Plaintiff's mental status; Dr. Park's mental status opinion could not be adopted because it was non-specific, and no other mental status opinions were in Plaintiff's file. (R. 150.)

d.     Dr. Wagman's Testimony

Dr. Wagman, a medical expert, testified at the administrative hearing. (R. 246-55.) In forming his opinion, he reviewed the medical evidence, but never personally examined Plaintiff. (R. 253.) Dr. Wagman stated that he found no evidence of cardiac disease during the relevant period. (R. 248-49.) Although a thallium stress test in February of 1997 returned positive, indicating possible diaphragmatic attenuation, Dr. Wagman opined that, in light of additional

evidence, the 1997 test had likely produced a false positive and was likely of no significance.

An angiogram in 1995 was negative; when plaintiff was admitted with chest pain to New York

Hospital of Queens in 1996, plaintiff's EKG was normal, and a myocardial infarction was ruled

out. Additionally, the stress and profusion imaging study conducted in 2004 was negative for

ischemia. Although Dr. Wagman acknowledged that the NYPD Board found Plaintiff disabled

with a diagnosis of coronary artery disease, he opined that they did so "without proof." (R. 251.)

Dr. Wagman did not opine on what effect Plaintiff's reported depression during the

period might have had on his condition, because he had no records of any treatment for

depression. (R. 254.) Although Plaintiff reported that Dr. Tenet had prescribed him Valium for

his depression, Dr. Wagman stated that this was an inappropriate treatment.

With regard to Plaintiff's arthritis, Dr. Wagman stated that Dr. Park's September 18,

2003 examination showed that Plaintiff had normal gait and station. (R. 249.) Plaintiff had a

straight leg raising to sixty percent, which Dr. Wagman noted was "a little bit of a limitation."

Plaintiff also had straightening of the lumbosacral spine. Dr. Wagman stated that there was "no

evidence of any real significant arthritic change on x-ray."

Dr. Wagman reported that Plaintiff was treated by Dr. Asters for his back pain during the

relevant period, and that Dr. Asters had reported that Plaintiff was suffering from severe arthritis

in parts of his body. (R. 253.) In Dr. Wagman's opinion, however, the proof for Dr. Asters'

conclusion was "lacking." He did not elaborate.

Dr. Wagman noted that during this period Plaintiff had Dupuytren's contracture in his left

ring finger, which he described as a thickening of the tendons of the finger, with the finger

frequently in a fixed position. (R. 249-50, 252-53.) Dr. Wagman stated that this would make

"fine motion," such as writing, difficult with the affected hand. Plaintiff is left-handed. Lifting would be "less of a problem."

3. <u>Evidence After the Relevant Period</u>

In an evaluation dated March 13, 2006, Dr. Asters reported that Plaintiff had been suffering from arthritis since 1996. (R. 162, 219.) Dr. Asters described Plaintiff's response to treatment as "worsening." (<u>Id.</u>) Plaintiff was taking Tylenol, Advil, Celebrex and Mobic for treatment. The doctor indicated that Plaintiff had difficulty caring for his personal needs. (<u>Id.</u>) Plaintiff complained of constant pain. (<u>Id.</u>) The doctor also reported that Plaintiff had nodes, some deformities of his hands, and thenar atrophy. (R. 163, 220.) There was mild weakness (4/5) in plaintiff's grip strength. (<u>Id.</u>) Coordination tests were normal. (<u>Id.</u>) Dr. Asters concluded that Plaintiff's condition resulted in moderate interference with both fine and gross dexterous movements of each upper extremity. (R. 164, 221.)

In treatment notes dated February 24, 2006, Dr. Asters reported that Plaintiff stated he had arm stiffness and was in constant pain. (R. 165, 222.) Upon examination, Plaintiff's blood pressure was 110/80. (<u>Id.</u>) He had mild synovitis. (<u>Id.</u>) Dr. Asters diagnosed osteoarthritis versus rheumatoid arthritis, lung cancer, depression/anxiety, fibromyalgia, and lumbago. (<u>Id.</u>) Laboratory studies revealed a negative rheumatoid factor and a negative antinuclear antibody. (R. 166, 223.)

When plaintiff returned to Dr. Asters on March 10, 2006, he complained that he recently fell on his knees. (R. 167, 224.) X-rays reportedly did not reveal a patella fracture. (<u>Id.</u>) There was medial joint space narrowing bilaterally. (<u>Id.</u>) Upon examination, plaintiff had crepitus of the knee and nodes in the hands. (<u>Id.</u>) Blood pressure was 110/80. (<u>Id.</u>) Dr. Asters diagnosed

stenosing tenosynovitis/trigger finger, lung cancer, lumbago, and crepitus of the knee, secondary to osteoarthritis, with loss of functionality. (Id.)

On March 13, 2006, Dr. Asters also completed a medical assessment of Plaintiff's ability to do physical work-related activities. (R. 168-69, 225-26.) Dr. Asters indicated that, due to osteoarthritis of Plaintiff's hands, lumbar spine, and knees, Plaintiff was able to lift/carry a maximum of five pounds frequently or occasionally, and stand/walk for one hour without interruption and for two hours total in an eight-hour day. (R. 168, 225.) Dr. Asters indicated that Plaintiff's ability to sit was not affected by his impairment. (Id.) Plaintiff was unable to climb or crawl, but he could occasionally stoop, kneel, balance, and crouch. (Id.) Plaintiff's abilities to reach, handle, feel, and push/pull were affected by his condition, and plaintiff had some environmental restrictions. (R. 169, 226.)

## II.    DISCUSSION

### A.    Legal Standards for Disability Benefits Eligibility

Claimants who are under the age of 55 and have insured status are eligible for disability insurance benefits if they are unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A). The impairment must be "of such severity that [the claimant] . . . cannot, considering his age, education, and work experience, engage in any . . . substantial gainful work which exists in the national economy." Id. § 423(d)(2)(A).

To determine whether an individual is entitled to disability benefits, the Commissioner employs a five-step sequential analysis, as follows:

(1) First, the Commissioner considers whether the claimant is currently engaged in substantial gainful activity.

(2) If he is not, the Commissioner next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities.

(3) If the claimant suffers such an impairment, the Commissioner must determine whether, based solely on medical evidence, the claimant has an impairment listed in Appendix 1 of the regulations. If the claimant has such an impairment, the Commissioner will consider him disabled without considering vocational factors such as age, education, and work experience.

(4) Assuming the claimant does not have a listed impairment, the Commissioner then asks whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work.

(5) If the claimant is unable to perform his past work, the Commissioner then determines whether there is other work which the claimant could perform.

See Rivera v. Schweiker, 717 F.2d 719, 722 (2d Cir. 1983) (citing 20 C.F.R. § 404.1520).

The inquiries at steps four and five follow from the Commissioner's determination of the claimant's residual functional capacity ("RFC"). 20 C.F.R. §§ 404.1520(a)(4)(iv)-(v). A claimant's RFC represents an assessment of his "ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis. It is the most a claimant can still do despite his or her limitations." Id. § 416.1545(a)(1). In the five-step analysis, the claimant bears the burden of proving the first four elements; at the fifth step, "there is a limited burden shift to the Commissioner" to "show that there is work in the national economy that the claimant can do." Poupore v. Astrue, 566 F.3d 303, 306 (2d Cir. 2009) (per curiam) (citing 20 C.F.R. § 404.1560(c)(2)).

When conducting the five-step analysis, the Commissioner considers: (1) objective medical facts and clinical findings; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant; and (4) the claimant's educational background, age, and work experience. Brown v. Apfel, 174 F.3d 59, 62 (2d Cir. 1999)). A claimant's impairments must be supported by "medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3); Balsamo v. Chater, 142 F.3d 75, 79 (2d Cir. 1998). In determining whether a claimant is disabled, the ALJ must consider the combined impact of all of the claimant's impairments on his ability to work. See 42 U.S.C. § 423(d)(2)(B) ("[T]he Commissioner of Social Security shall consider the combined effect of all of the individual's impairments without regard to whether any such impairment, if considered separately, would be of such severity.").

**B.     The ALJ's Determination**

The ALJ here applied the five-step analysis and concluded that during the relevant period Plaintiff was not disabled within the meaning of the Act. At step one, the ALJ found that Plaintiff had not "engage[d] in substantial gainful activity" since at least May 14, 1998. (R. 17.) At step two, the ALJ determined that Plaintiff's impairments—hypertension, a history of heart disease, a history of rheumatoid arthritis, and carpal tunnel syndrome—were "severe." (Id.) At step three the ALJ determined that those impairments did not meet or medically equal any of the listed impairments in Appendix 1 of the regulations. (R. 18.) At step four, the ALJ found that Plaintiff retained the RFC to perform "sedentary to light work." (R. 18.) The ALJ also found that Plaintiff was "unable to perform [his] past relevant work" as a police officer, which required an exertional ability that exceeded Plaintiff's RFC. (R. 21.) The ALJ was therefore required to proceed to step five of the analysis. At step five, the ALJ determined that Medical-Vocational

Rules 202.28, 201.21, and 202.2 (in 20 C.F.R. § 404, subpt. P, app. 2) (the "grids"), although not binding in this case, could be "used as a 'framework' for decision making." (R. 21-22.) Using the grids as a framework, the ALJ found that, "[b]ased on a residual functional capacity for sedentary to light work," and "considering [Plaintiff's] age, education, and work experience," Plaintiff was not "disabled" under the Act at any time during the relevant period. (Id.)

The parties do not dispute the validity of the ALJ's findings with regard to the first and second steps of the five-step analysis. Nor does Plaintiff appear to dispute the ALJ's finding at step three—that his impairments did not meet or medically equal an impairment in the listings. Rather, Plaintiff appears to contest the ALJ's determination that during the relevant period he had the functional capacity to perform light to sedentary work.[3]

### C.    Standard of Review

"A district court may set aside the Commissioner's determination that a claimant is not disabled only if the factual findings are not supported by substantial evidence, or if the decision is based on legal error." Burgess v. Astrue, 537 F.3d 117, 127 (2d Cir. 2008) (internal quotation marks omitted).

"To determine whether the findings are supported by substantial evidence, the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn." Snell v. Apfel, 177 F.3d 128, 132 (2d Cir. 1999). "Substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Consol. Edison Co. v.

---

[3] See, e.g., Pl.'s Resp. to Def.'s Mot. on the Pleadings (Docket Entry No. 12) ("Social Security claims that he is not entitled because he was only partially disabled from 1998 to December 13th 2003. . . . He has been disabled since he retired"; see also Letter from Claimant's Representative to Appeals Council, July 10, 2008 (R. 233-37) ("Since 1998, Mr. Hilsdorf's condition has degenerated to the extent that between 1998 and December 31, 2003, he did not even have the functional capacity to perform work at the sedentary level.").

NLRB, 305 U.S. 197, 229 (1938) (cited in Zabala v. Astrue, 2010 WL 455480, at *4 (2d Cir. 2010)). "Where the Commissioner's decision rests on adequate findings supported by evidence having rational probative force, [the court] will not substitute [its] judgment for that of the Commissioner." Veino v. Barnhart, 312 F.3d 578, 586 (2d Cir. 2002); see also 42 U.S.C. § 405(g) ("The findings of the [Commissioner] as to any fact, if supported by substantial evidence, shall be conclusive . . . .").

This deferential standard of review does not apply, however, to the ALJ's legal conclusions. Byam v. Barnhart, 336 F.3d 172, 179 (2d Cir. 2003). "[W]here an error of law has been made that might have affected the disposition of the case," the court will not defer to the ALJ's determination. Pollard v. Halter, 377 F.3d 183, 189 (2d Cir. 2004) (internal quotation marks omitted). Rather, an ALJ's "[f]ailure to apply the correct legal standards is grounds for reversal." Id. Legal error may include failure to adhere to the applicable regulations. See Kohler v. Astrue, 546 F.3d 260, 265 (2d Cir. 2008).

### D.  The Commissioner's Duty to Develop the Record

Although "[t]he claimant has the general burden of proving that he or she has a disability within the meaning of the Act," nevertheless, "because a hearing on disability benefits is a non-adversarial proceeding, the ALJ generally has an affirmative obligation to develop the administrative record." Burgess, 537 F.3d at 128 (internal quotation marks and brackets omitted); see also Sims v. Apfel, 530 U.S. 103, 111 (2000) (noting that the non-adversarial nature of Social Security proceedings requires the ALJ "to investigate the facts and develop the arguments both for and against granting benefits"). This duty is present "[e]ven when a claimant is represented by counsel." Moran v. Astrue, 569 F.3d 108, 112 (2d Cir. 2009).

The ALJ has both a statutory and regulatory duty to fully develop the claimant's complete medical history for at least the twelve month period prior to the date that the claimant filed for disability. Ericksson v. Comm'r of Soc. Sec., 557 F.3d 79, 83 (2d Cir. 2009); see also 42 U.S.C. § 423(d)(5)(B) (providing that ALJ "shall develop a complete medical history of at least the preceding twelve months for any case in which a determination is made that the individual is not under a disability") (emphasis added); 20 C.F.R. § 404.1512(d) ("Before we make a determination that you are not disabled, we will develop your complete medical history for at least the 12 months preceding the month in which you file your application unless there is a reason to believe that development of an earlier period is necessary.") (emphasis added). In some instances, the ALJ may be required to develop a claimant's medical history for an even longer period "if there [is] reason to believe that the information [is] necessary to reach a decision." DeChirico v. Callahan, 134 F.3d 1177, 1184 (2d Cir. 1998).

Under the "treating-physician rule," the opinion of a claimant's treating physician "regarding the nature and severity of [the claimant's] impairments" will be given controlling weight if it "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record."[4]  20 C.F.R. § 404.1527(d)(2); see also Burgess v. Astrue, 537 F.3d 117, 128 (2d Cir. 2008). As a result, the opinion of a treating physician is an especially important part of the record to be

---

[4] A treating physician is defined as the claimant's own physician "who has provided the individual with medical treatment or evaluation, and who has or who had an ongoing treatment and physician-patient relationship with the individual." Sokol v. Astrue, No. 04-CV-6631 (KMK) (LMS), 2008 WL 4899545, at *12 (S.D.N.Y. Nov. 12, 2008) (quoting Schisler v. Sullivan, 3 F.3d 563, 569 (2d Cir. 1993)) (internal quotation marks omitted). Generally, the opinions of treating physicians are entitled to more weight because "these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [the claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical evidence alone or from reports of individual examinations, such as consultative examinations." 20 C.F.R. § 404.1527(d)(2). Failure to satisfy the treating physician rule constitutes legal error, and "ordinarily requires remand to the ALJ for consideration of the improperly excluded evidence." Zabala, 2010 WL 455480, at *5-6.

developed by the ALJ. Hence, the Social Security Act provides that the Commissioner "shall make every reasonable effort[5] to obtain from the individual's treating physician (or other treating health care provider) all medical evidence, including diagnostic tests, necessary in order to properly make [a disability determination], prior to evaluating medical evidence obtained from any other source on a consultative basis." 42 U.S.C. § 423(d)(5)(B).

When the ALJ perceives a gap in the record concerning the findings of a treating physician, the ALJ has an affirmative obligation to seek out the missing information. Schaal, 134 F.3d at 505 (citing Perez v. Chater, 77 F.3d 41, 47 (2d Cir. 1996)); see also Rosa v. Callahan, 168 F.3d 72, 79 (2d Cir. 1999) ("[W]here there are deficiencies in the record, an ALJ is under an affirmative obligation to develop a claimant's medical history even when the claimant is represented by counsel . . . .") (internal quotation marks omitted).

Similarly, if the record evidence is inadequate to determine whether an individual is disabled, the ALJ must re-contact the claimant's medical source to gather additional information. 20 C.F.R. § 404.1512(e). Specifically, this duty requires the ALJ to "seek additional evidence or clarification" from the claimant's treating sources when their reports are "inadequate . . . to determine whether [the claimant] is disabled." Id. §§ 404.1512(e), (e)(1). The ALJ "may do this by requesting copies of [the claimant's] medical source's records, a new report, or a more detailed report from [the] medical source." Id. § 404.1512(e)(1). Further, "the ALJ must not only develop the proof but carefully weigh it." Donato v. Sec'y of Dept. of Health & Human Servs., 721 F.2d 414, 419 (2d Cir. 1983). The regulations do not require a medical source to be

---

[5]"Reasonable effort" under the regulations entails making an initial request, and, if necessary, one follow-up request within 20 calendar days, "to obtain the medical evidence necessary to make a determination." 20 C.F.R. § 404.1512(d)(1).

re-contacted, however, when the ALJ "know[s] from past experience that the source either cannot or will not provide the necessary findings." 20 C.F.R. § 404.1512(e)(2).

If the information obtained from the claimant's medical sources is not sufficient to make a disability determination, or the Commissioner is unable to seek clarification from treating sources, the Commissioner will then ask the claimant to attend one or more consultative evaluations. Id. § 404.1512(f). However, "a consulting physician's opinions or report should be given limited weight." Cruz v. Sullivan, 912 F.2d 8, 13 (2d Cir. 1990). "This is justified because consultative exams are often brief, are generally performed without benefit or review of claimant's medical history and, at best, only give a glimpse of the claimant on a single day. Often, consultative reports ignore or give only passing consideration to subjective symptoms without stated reasons." Id. (internal quotation marks omitted).

In this case, the ALJ failed to sufficiently develop the record. The ALJ failed to obtain any treatment records relating to Plaintiff's arthritis during the relevant period. The record contains numerous references – spanning dozens of pages – to Plaintiff's history and complaints of arthritis and his treatment by Dr. Asters, one of his treating physicians. It is clear from the record that Dr. Asters was treating Plaintiff prior to July 2003 – that is, during the relevant period. (R. 82.) Yet Dr. Asters' treatment notes and medical opinions from the relevant period are conspicuously absent from the record. In fact, Dr. Asters is nowhere even mentioned in the ALJ's decision, and the ALJ, rather than using alternative medical evidence to assess the effects

of Plaintiff's arthritis, simply omitted <u>any</u> discussion of the nature or severity of Plaintiff's arthritis or its impact on his functioning.[6]

The ALJ himself acknowledged that "[t]he file contains a miniscule amount of treatment evidence for the period under consideration." (R. 21.) The record contains no opinions from either of Plaintiff's treating physicians – Dr. Asters for arthritis and Dr. Tenet for heart problems – regarding his functional abilities during the relevant period. Every medical opinion in the record relating to the relevant period comes from a non-treating physician, only one of whom personally examined Plaintiff; these non-treating physician reports occupy a mere six pages of the record. Given the complete absence from the file of contemporaneous medical evidence from Dr. Asters and Dr. Tenet – Plaintiff's treating physicians – there are clearly very significant gaps and deficiencies in the record. <u>See</u> <u>Devora v. Barnhart</u>, 205 F. Supp. 2d 164, 172-73 (S.D.N.Y. 2002) ("The duty of the ALJ to develop the record is particularly important when it comes to obtaining information from a claimant's treating physician.").

The only recorded attempts to contact Dr. Asters were made by the SSA in 2003, first on August 1 and again on September 8 (R. 107) – nearly five years before the ALJ rendered his decision. (R. 22.) A "Disability Worksheet" notes that Dr. Asters "did not respond to our requests." (R. 107.) Although an ALJ may decline to seek additional records when he "know[s] from past experience that the source either cannot or will not provide the necessary findings," 20 C.F.R. § 404.1512(e)(2), the ALJ did not indicate that this was the reason for the missing records; as mentioned above, the ALJ's decision makes no reference to Dr. Asters whatsoever. Without some reasonable explanation for the ALJ's failure to obtain these records, the court is

---

[6] The only references in the ALJ's decision to Plaintiff's arthritis are: (1) the ALJ's acknowledgment that Plaintiff did indeed have a "history of rheumatoid arthritis," which constituted a "severe impairment" (R. 17); (2) Dr. Park's diagnosis of "a history of rheumatoid arthritis with a normal range of motion" (R. 20); and (3) Dr. Wagman's assertion that there was "no evidence of real significant [arthritic] changes on the x-rays." (<u>Id.</u>)

not satisfied that the ALJ fulfilled his affirmative obligation to develop the record. See Hardhart v. Astrue, No. 05-CV-2229 (DRH), 2008 WL 2244995, at *9 (E.D.N.Y. May 29, 2008).

Moreover, the record in this case does in fact contain treatment notes from Dr. Asters from 2006 – after the relevant period – including a full assessment of Plaintiff's RFC at that time. (R. 162-69.) That Dr. Asters, at some point, did in fact submit medical records and opinions forecloses the possibility that the ALJ failed to obtain records from the relevant period simply because he knew from experience that Dr. Asters would not cooperate. See Pitcher v. Barnhart, No. 06-CV-1395 (LEK) (VEB), 2009 WL 890671, at *14 (N.D.N.Y. March 30, 2009) (finding that, even where treating physician was unresponsive to two earlier requests, the existence of same physician's treatment notes in the record suggested that ALJ's failure to obtain relevant records could not be explained by ALJ's knowledge that physician would not provide the necessary findings).[7]

Although the ALJ offered no explanation for the lack of evidence from Dr. Asters, he did attempt to explain the lack of evidence from Dr. Tenet: "Attempts to obtain information from the claimant's treating physician, Dr. Tenet, did not result in any evidence from the source, despite repeated requests." (R. 20.) The ALJ then refers to a partially completed RFC assessment submitted by Dr. Tenet. (R. 20, 130.) As discussed, under the regulations the ALJ would have been excused from re-contacting Dr. Tenet only if he had "know[n] from past experience that the

---

[7] Where courts have found that an ALJ was not obligated to re-contact a plaintiff's treating physician, there was often already substantial evidence in the file in the form of records or opinions from that physician; the ALJ simply declined to re-contact the physician for further or more detailed findings. See, e.g., Blanda v. Astrue, No. 05-CV-5723 (DRH), 2008 WL 2371419, at * 10 and n.9 (E.D.N.Y. June 09, 2008) (finding that ALJ did not err by refusing to afford treating physician "yet another opportunity to submit a more detailed response" when treatment records were already obtained); Hill v. Barnhart, 410 F. Supp. 2d 195, 209 (S.D.N.Y. 2006) (finding that the ALJ was not required to re-contact treating physician when he already "had before him a complete medical history, and the evidence received from the treating physicians was adequate for him to make a determination as to disability") (internal quotation marks omitted). In this case, however, there are no treatment records from Dr. Asters during the relevant period.

[doctor] either [could] not or [would] not provide the necessary findings." 20 C.F.R. §
404.1512(e)(2). Dr. Tenet's submission of a partially completed assessment, far from
demonstrating unwillingness to cooperate, suggest that Dr. Tenet was responsive to requests for
information. The fact that the submitted report was incomplete did not relieve the ALJ of his
obligation to re-contact Dr. Tenet; on the contrary, the regulations specifically require an ALJ to
"seek additional evidence or clarification from [the claimant's] medical source when the report
from [that] medical source . . . does not contain all the necessary information . . . ." 20 C.F.R. §
404.1512(e)(1) (emphasis added); see also Clark v. Comm'r of Soc. Sec., 143 F.3d 115, 118 (2d
Cir. 1998) (recognizing that a treating physician's "failure to include [proper] support for the
findings in his report does not mean that such support does not exist; he might not have provided
this information in the report because he did not know that the ALJ would consider it critical to
the disposition of the case").

   The Commissioner asserts that the ALJ fully satisfied his duty to develop the record
because, at the administrative hearing, Plaintiff's representative "stated that the [medical] record
was complete for the matter under consideration in this case." (R. 19; Def. Mem. (Docket Entry
# 11) 19, n.5.) That is not enough. Where, as here, it is apparent from the face of the record that
the record lacks necessary information, the ALJ cannot be relieved of his affirmative obligation
to develop the record by a statement of counsel. Cf. Maes v. Astrue 522 F.3d 1093, 1097 (10th
Cir. 2008) (finding that ALJ did not fail to develop the record when claimant's counsel indicated
that the record was complete because "the missing medical records [were] not obvious from the
administrative record or otherwise brought to the attention of the ALJ").

   In sum, the ALJ failed to properly develop the record with medical evidence central to
this case. There are no treatment records relating to Plaintiff's arthritis during the relevant

period, and the decision contains no discussion of the nature or severity of Plaintiff's arthritis or its impact on his functioning. Moreover, the record contains no opinions from any treating physician regarding Plaintiff's functional abilities during the relevant period. Given the deficiencies in the medical evidence, the ALJ had an affirmative duty to seek out and obtain the relevant records from Dr. Asters and Dr. Tenet in order to properly develop Plaintiff's medical history in this respect, and his failure to do so constitutes legal error. See Rosa, 168 F.3d at 80 (remanding, in part, for failure of ALJ to obtain records from physicians identified by claimant during her testimony, where record did not include materials from reported visits to those physicians).

### E.    The Commissioner's RFC Determination

As mentioned above, a claimant's RFC represents an assessment of his "ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis. It is the most a claimant can still do despite his or her limitations." 20 C.F.R. § 416.1545(a)(1). Here, the ALJ found that Plaintiff remained capable of performing "sedentary to light work" during the relevant period. [8] (R. 18.) The ALJ's RFC determination is deficient in a number of respects. Although the ALJ's failure to develop the record, standing alone, merits

---

[8] The regulations define light work as "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds." S.S.R. 83-10, 1983 WL 31251 (1983); 20 C.F.R. § 404.1567(b). It also "requires a good deal of walking or standing" or "sitting most of the time but with some pushing and pulling of arm-hand or leg-foot controls . . . ." Id. "[T]he full range of light work requires standing or walking, off and on, for a total of approximately 6 hours of an 8-hour workday." Id.

Sedentary work is less demanding than light work and involves "lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although sedentary work is primarily performed while sitting, some walking and standing is often necessary: "periods of standing or walking should generally total no more than about 2 hours of an 8-hour workday, and sitting should generally total approximately 6 hours of an 8-hour workday." Id. Additionally, most unskilled sedentary jobs "require good use of the hands and fingers for repetitive hand-finger actions." Id.

remand, these additional errors bear mentioning so that they can be corrected when the Commissioner reconsiders Plaintiff's application.

### 1. The ALJ Failed to Produce Proper Expert Medical Opinion as to Plaintiff's RFC

An ALJ's obligation to obtain necessary medical records includes an obligation to obtain a proper assessment of the claimant's RFC. See 20 C.F.R. § 404.1513(b) (describing "medical reports" as including "statements about what [a claimant] can still do"). Because an RFC determination is a medical determination, an ALJ who makes an RFC determination in the absence of supporting expert medical opinion has improperly substituted his own opinion for that of a physician, and has committed legal error. See Woodford v. Apfel, 93 F. Supp. 2d 521, 529 (S.D.N.Y. 2000) ("An ALJ commits legal error when he makes a residual functional capacity determination based on medical reports that do not specifically explain the scope of claimant's work-related capabilities."); Zorilla v. Chater, 915 F. Supp. 662, 666-67 (S.D.N.Y. 1996) ("The lay evaluation of an ALJ is not sufficient evidence of the claimant's work capacity; an explanation of the claimant's functional capacity from a doctor is required.").

In this case, Defendant asserts that "multiple medical opinions support the ALJ's residual functional capacity determination." Specifically, he points to reports from Dr. Park and Dr. Virgo. Neither report is adequate, however.

To demonstrate that Plaintiff was capable of light to sedentary work, the ALJ points to Dr. Park's statement that Plaintiff had "limitations of a mild degree of lifting, bending, walking, standing, and pushing and pulling on arm controls." (R. 20-21.) This vague statement cannot serve as an adequate basis for determining Plaintiff's RFC. See Curry v. Apfel, (finding that a doctor's opinion that "plaintiff's impairment is: lifting and carrying moderate; standing and

walking, pushing and pulling and sitting mild" was "so vague as to render it useless in evaluating whether [the plaintiff] [could] perform sedentary work.") In particular, Dr. Park's use of the term 'mild' did not provide enough information to allow the ALJ to make the necessary inference that Plaintiff could perform sedentary work. [9]

The ALJ also relied on Dr. Virgo's report. Dr. Virgo opined that Plaintiff was able to do at least medium work – that is, lift fifty pounds and walk or stand six out of eight hours. (R. 141.) Dr. Virgo's report, standing alone, cannot support the ALJ's determination. Dr. Virgo failed to provide any medical evidence or basis for his conclusions. Further, Dr. Virgo neither treated nor examined Plaintiff; rather, he based his opinion on tests and examinations conducted by other physicians. (Id.) Medical reports that are not based on personal observation "deserve little weight in the overall evaluation of disability." Vargas v. Sullivan, 898 F.2d 293, 295-96 (2d Cir. 1990); see also Filocomo v. Chater, 944 F. Supp. 165, 170 n.4 (E.D.N.Y. 1996) (reliance on RFC assessment "completed by a doctor who never physically examined Plaintiff" would be "unfounded, as the conclusions of a physician who merely reviews a medical file and performs no examination are entitled to little if any weight.").

Because the reports by Dr. Park and Dr. Virgo – whether considered separately or in combination – were inadequate, the ALJ failed to obtain an adequate medical assessment of Plaintiff's functional abilities. As discussed above, the record contains no opinions from any of Plaintiff's treating physicians regarding his functional abilities during the relevant period. An RFC assessment from Plaintiff's treating sources was especially important in this case, given the

---

[9] To make matters worse, Dr. Park's statement is syntactically unclear: although Defendant takes the position that "mild" refers to the degree of Plaintiff's "limitations," "mild" may just as well qualify Plaintiff's maximum "degree of" exertion. Whereas Defendant's reading of the statement still allows for significant ability to lift, etc., the alternate interpretation suggests that lifting, etc. is significantly limited. Regardless of the statement's proper interpretation, however, Dr. Park's statement cannot support the ALJ's RFC determination.

absence of an adequate RFC assessment from any other proper source.[10] By failing to support the RFC determination with proper expert medical evidence, the ALJ committed legal error.

        2.      The ALJ Failed to Perform the Required Function-by-Function
                   Assessment of Plaintiff's RFC

In assessing a claimant's RFC, the ALJ must "first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis . . . . Only after that may RFC be expressed in terms of the exertional levels of work, sedentary, light, [etc.]" S.S.R. 96-8p, 1996 WL 374184, at *1 (1996). The ALJ is required to assess a claimant's ability "to perform each of seven strength demands: Sitting, standing, walking, lifting, carrying, pushing, and pulling. Each function must be considered separately. . . ." Id. at *5. The ALJ must also discuss the claimant's ability to perform these functions in an ordinary work setting on a regular and continuing basis (i.e., 8 hours a day, for 5 days a week, or an equivalent work schedule), and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record." Id. at *7.

Here, the ALJ failed to assess Plaintiff's ability to perform any of these particular functions, let alone on a "regular and continuing" basis. The closest thing in the ALJ's decision to a function-by-function assessment is a one-sentence reference to Dr. Park's determination that Plaintiff "had a 'mild' degree of limitations for lifting, bending, walking, standing, and pushing/pulling with the arms." (R. 20.) Beyond this vague statement, the decision contains no discussion of Plaintiff's ability to perform each of the seven strength demands as required by the

---

[10] The only complete RFC opinion in the file was filled out by R. Arnold, a DDS disability analyst, who is apparently not a doctor, and whose opinions are not entitled to any medical weight. See Barton v. Astrue, No. 3:08-CV-0810 (FJS)(VEB), 2009 WL 5067526, at *3 (N.D.N.Y. Dec. 16, 2009) (concluding it was "error to grant the disability analyst's opinion 'some weight,' as if it were a medical opinion"); Arteaga v. Astrue, 2007 WL 2402871, at *17 (S.D.N.Y. Aug. 15, 2007) (finding ALJ's statement that disability analyst was entitled to medical weight erroneous).

regulations, and certainly never explains why Plaintiff's abilities in these areas enable him to meet the demands of "sendentary to light work." See Amrod v. Comm'r of Soc. Sec., No. 08-CV-464, 2010 WL 55934, at *17 (N.D.N.Y. Jan 05, 2010) ("When making an RFC determination, an ALJ must specify those functions which the claimant is capable of performing; conclusory statements concerning his or her capabilities, however, will not suffice.").

Because the ALJ failed to assess Plaintiff's exertional and postural abilities on a function-by-function basis, his RFC determination cannot be upheld by this court. See Brown v. Barnhart, No. 01-CV-2962 (JG), 2002 WL 603044, at *5-6 (E.D.N.Y. Apr 15, 2002) (holding that ALJ's RFC findings were inadequate because he did not evaluate the claimant's abilities on a "function-by-function" basis, or assess claimant's capacity to work on a "regular and continuing" basis).

### 3. The ALJ Improperly Discredited Plaintiff's Subjective Complaints of Pain

The administrative record is replete with reports and testimony describing Plaintiff's complaints of severe and debilitating pain in his back, neck, arms, hips, and shoulders. Indeed, the ALJ acknowledged that Plaintiff's allegations of pain were reasonably supported by objective medical evidence in the record. (R. 20.) Nonetheless, the ALJ found Plaintiff not to be disabled because, while Plaintiff concededly suffered from pain, the ALJ found that Plaintiff's claims regarding the extent to which he was impaired by that pain were "not entirely credible." (R. 20-21.) Upon review of the ALJ's decision, the court finds that the ALJ did not provide sufficient grounds for discrediting Plaintiff's subjective complaints of pain.

SSA regulations require the Commissioner, in making disability determinations, to consider all of a claimant's symptoms, including subjective complaints of pain. 20 C.F.R. § 404.1529(a). The Second Circuit has held that a claimant's testimony regarding subjective pain

and suffering is "probative on the issue of disability [and] may serve as the basis for establishing disability." Echevarria, 685 F.2d at 756. When a claimant has a medically determinable impairment that can reasonably be expected to produce the alleged pain, the Commissioner must evaluate the intensity, persistence, and functionally limiting effects of that pain. 20 C.F.R. § 404.1529(c)(1). Further, because a claimant's symptoms, such as pain, "sometimes suggest a greater severity of impairment than can be shown by objective medical evidence alone," once a claimant has been found to have a pain-producing impairment, the Commissioner may not reject the claimant's statements about his pain solely because objective medical evidence does not substantiate those statements. 20 C.F.R. §§ 404.1529(c)(2)-(3). Rather, the ALJ must consider the following factors in evaluating a claimant's complaints of pain: (1) the claimant's daily activities; (2) the location, duration, frequency, and intensity of the claimant's pain or other symptoms; (3) precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medication that the claimant takes to alleviate pain or other symptoms; (6) any measures the claimant uses to relieve pain or other symptoms; and (7) other factors concerning the claimant's functional limitations and restrictions due to pain or other symptoms. See id. §§ 404.1529(c)(3)(i)-(vii).

Although it is the function of the Commissioner and not the reviewing court to evaluate a claimant's credibility, a "finding that the witness is not credible must nevertheless be set forth with sufficient specificity to permit intelligible plenary review of the record." Williams v. Bowen, 859 F.2d 255, 260-61 (2d Cir. 1988). Therefore, an "ALJ's decision to discount a claimant's subjective complaints of pain" will be upheld only when that decision is "supported by substantial evidence." Aponte v. Sec'y Dept. of Health & Human Servs., 728 F.2d 588, 591 (2d Cir. 1984). The standard is not satisfied in this case.

Defendant argues that the ALJ correctly concluded, based on substantial evidence, that Plaintiff's statements about his subjective symptoms were not entirely credible. (Def. Mem. 19.) Specifically, he notes that the ALJ pointed to (1) the "miniscule amount of treatment evidence [in the file] for the period under consideration"; (2) the opinion of Dr. Park that Plaintiff "had only some 'mild' limitations in functioning"; (3) the opinion of Dr. Virgo that Plaintiff was "capable of 'medium' work"; (4) the Police Medical Board's "reluctan[ce]" to grant Plaintiff's disability application in the face of "little positive clinical evidence"; (5) the fact that Plaintiff was not taking any medication for a heart condition at the time of the consultative examination in 2003; and (6) Plaintiff's daily activities, as reported in his disability application and to Dr. Park. (R. 21.) None of these reasons, however, provide an adequate basis for discounting Plaintiff's credibility.

As to the first contention, the absence of treatment evidence from the relevant period is not an indication of the absence of disability; rather, it is an indication of the ALJ's failure to comply with his obligations, as set forth above. As such, it cannot serve as a basis to discredit Plaintiff's claims. Moreover, once the ALJ found that Plaintiff's medically determinable impairments could reasonably have been expected to produce the alleged symptoms, (R. 20), he could not then reject Plaintiff's statements about his pain on the grounds that objective medical evidence does not substantiate those statements. See 20 C.F.R. § 404.1529(c)(2) ("[W]e will not reject your statements about the intensity and persistence of your pain or other symptoms or about the effect your symptoms have on your ability to work solely because the available objective medical evidence does not substantiate your statements."); Green-Younger v. Barnhart, 335 F.3d 99, 108 (2d Cir. 2003) ("[S]ubjective pain may serve as the basis for establishing

disability, even if . . . unaccompanied by positive clinical findings of other 'objective' medical evidence.").

The second and third contentions are also meritless. As previously discussed, Dr. Park's statement cannot be taken as evidence that Plaintiff was capable of light or even sedentary work. Further, there is no indication that Dr. Park took Plaintiff's complaints of pain into account when formulating his opinion. Likewise, Dr. Virgo never examined or even met with Plaintiff, and so his opinion necessarily failed to take into account Plaintiff's subjective complaints as well. See Mimms v. Heckler, 750 F.2d 180, 186 (2d Cir. 1984) ("An ALJ is not free to assume that a factor, such as pain, was considered in formulating a medical opinion when there is no evidence that such was the case."). As such, neither doctor's opinion supports the ALJ's finding that Plaintiff's subjective complaints of pain were not credible.

As to the fourth contention, although the Police Medical Board felt that there was little positive clinical evidence of coronary artery disease, that opinion was based solely on medical evidence from long before the relevant period. Without a doubt, prior to 2000 Plaintiff did not suffer a disabling heart condition; that was established upon final adjudication of Plaintiff's first disability application in Hilsdorf I. Neither the decision of the police board in 1998 nor the decision in Hilsdorf I, however, precludes the possibility that Plaintiff later became disabled at some time within the relevant period – that is, before December 31, 2003. Moreover, the issue of Plaintiff's arthritis was not even before the Police Medical Board or the Court in Hilsdorf I.[11] Therefore, statements regarding the nature of Plaintiff's heart condition prior to the relevant

---

[11] Hilsdorf I noted that "[w]hile plaintiff's wife, in a letter to this court . . . stated that her husband . . . had been diagnosed with rheumatoid arthritis . . . th[is] injur[y] was [not] reflected in the evidence before the court. If new medical evidence has come to light, plaintiff can file a new application with the Commissioner." Hilsdorf I, No. 03-CV-2435, at 20 n.5. Plaintiff did just that, and the new application is the subject of this litigation.

period cannot be used to discount the severity of his symptoms as they existed several years after those statements were made, especially those unrelated to his heart condition.

Similarly, the fact that Plaintiff was not taking any medication for a heart condition on September 18, 2003 has no bearing on the existence of functional limitations caused by Plaintiff's other impairments. Plaintiff alleges severe functional limitations due to arthritic pain. And indeed, Dr. Park reported that on September 18, 2003, Plaintiff was taking medication—Celebrex—for his arthritic pain. Yet, the ALJ neglected to take this into account, despite his obligation to do so. See S.S.R. 96-7p, 1996 WL 374186.

Finally, the ALJ's conclusion that Plaintiff's reported daily activities were inconsistent with Plaintiff's subjective complaints of pain is not supported by substantial evidence in the record. Although the ALJ noted that Plaintiff took walks during the day, drove a car, did some shopping, and smoked a pack of cigarettes a day, he wholly ignored the qualifications that Plaintiff placed on his ability to engage in these activities.

First, although Plaintiff stated that he took walks during the day, he added that he could walk only "2 to 3 blocks" before having to stop and rest for "a few minutes" before he could continue walking – a fact that the ALJ neglected to consider. Plaintiff testified at his hearing before the ALJ that he was unable to walk more than "[a] couple of blocks." (R. 244.) Second, although Plaintiff reported that he did some shopping, he described it as "very limited shopping" for his medications, depending on how he felt that day (R. 100), a highly significant qualification not mentioned by the ALJ. Third, the only indication in the record that Plaintiff drove a car is a box that he checked in a questionnaire. The frequency, duration, and purpose of his driving are unknown. If the ALJ had any misgivings about Plaintiff's subjective symptoms because he

drove a car, he had an obligation to question Plaintiff in order to ascertain the circumstances under which he engaged in that activity.

However, the ALJ failed to clarify the particular nature of <u>any</u> of Plaintiff's daily activities. The ALJ could easily have resolved any such uncertainties by questioning Plaintiff further at the hearing. He did not. In fact, the ALJ did not ask Plaintiff a single question about his subjective symptoms throughout the entire hearing, despite his obligation to do so. <u>See</u> <u>Hankerson v. Harris</u>, 636 F.2d 893, 895-96 (2d Cir. 1980) ("[W]here medical records before the ALJ contained a number of references to plaintiff's subjective symptoms, it was particularly important that the ALJ explore these symptoms with plaintiff so the ALJ could effectively exercise his discretion to evaluate the credibility of the claimant.") (internal quotation marks omitted).

Consequently, there is nothing to suggest that Plaintiff "engaged in any of these activities for sustained periods comparable to those required to hold [even] a sedentary job." <u>Balsamo</u>, 142 F.3d at 81. The mere fact that Plaintiff engaged in these activities, standing alone, is meaningless.[12] The Second Circuit has stated on numerous occasions that "a claimant need not be an invalid to be found disabled." <u>Id.</u> (quoting <u>Williams v. Bowen</u>, 859 F.2d 255, 260 (2d Cir. 1988)); <u>see also</u> <u>Smith v. Califano</u>, 637 F.2d 968 (3d Cir. 1981) ("Disability does not mean that a claimant must vegetate in a dark room excluded from all forms of human and social activity. . . . It is well established that sporadic or transitory activity does not disprove disability.").

---

[12] Similarly, the fact that Plaintiff smoked is not an adequate basis for discrediting his complaints of pain. Courts have recognized that "[g]iven the addictive nature of smoking, the failure to quit is as likely attributable to factors unrelated to the effect of smoking on a person's health. One does not need to look far to see persons with emphysema or lung cancer—directly caused by smoking—who continue to smoke, not because they do not suffer gravely from the disease, but because other factors such as the addictive nature of the products impacts their ability to stop. This is an unreliable basis on which to rest a credibility determination." <u>Riechl v. Barnhart</u>, No. 02-CV-6169 (CJS), 2003 WL 21730126, at *13 (W.D.N.Y. June 03, 2003) (quoting <u>Shramek v. Apfel</u>, 226 F.3d 809, 813 (7th Cir. 2000)).

Thus, none of the ALJ's reasons for discrediting Plaintiff's subjective complaints of pain, either separately or in combination, provided a valid basis for doing so. Moreover, because the ALJ failed to question Plaintiff at the hearing about the nature of his activities or limitations, the ALJ neglected his obligation to "pursue opportunities to evaluate further plaintiff's subjective complaints." Connor v. Barnhart, 2003 WL 21976404, at *7 (S.D.N.Y. Aug.18, 2003) (finding that ALJ's failure to inquire about specific nature of claimant's pain constituted a failure to sufficiently develop the record). Rather, the ALJ improperly drew his own conclusions about Plaintiff's daily functioning, which were not supported by substantial evidence.

### 4.    The ALJ Failed to Consider Significant Limitations Reported by Plaintiff

Plaintiff reported and testified to serious limitations that could have rendered him incapable of light or sedentary work, yet the ALJ failed to even mention these limitations. In several places in the record, as well as in his hearing testimony, Plaintiff reported that he was unable to sit or stand for more than 30 minutes at a time without experiencing discomfort and pain. (R. 82, 101, 244.) This assertion is supported by Dr. Park's report stating that Plaintiff's ability to stand was limited. Additionally, at the administrative hearing, Plaintiff testified that due to excessive fatigue he had to lie down "two or three times day" for half-hour periods. (R. 243.)

These limitations are highly significant. Light work "requires a good deal of walking or standing, or . . . sitting most of the time with some pushing and pulling of arm or leg controls." 20 C.F.R. § 404.1567(b) (emphasis added). "Sedentary" work by its very nature "requires a person to sit for long periods of time even though standing and walking are occasionally required." Carroll, 705 F.2d at 643 (emphasis added) (citing 20 C.F.R. §§ 404.1567(a), (b)). "Moreover, alternating between sitting and standing may not be within the concept of sedentary

work." Ferraris, 728 F.2d at 587; see also Delgado v. Heckler, 722 F.2d 570, 574 (9th Cir. 1983) ("A man who cannot walk, stand or sit for over one hour without pain does not have the capacity to do most jobs available in the national economy.") Similarly, if Plaintiff needed to lie down several times during the day, the range of work available to him would be seriously limited. See Green v. Barnhart, No. 07-CV-0023, 2009 WL 68828, at *11 (W.D.N.Y. Jan 06, 2009).

The ALJ conceded that Plaintiff's admittedly severe medical impairments were reasonably capable of producing the pain of which he complained. Therefore, at step five of the analysis, the Commissioner had the burden to show that Plaintiff was capable of performing light and/or sedentary work. That means the Commissioner was required to prove with substantial evidence that Plaintiff's limited ability to sit or stand would prevent him from performing such work. He failed to do so. Plaintiff's reported inability to walk, stand, or sit for extended periods of time therefore stands uncontradicted, and the ALJ's RFC determination is not supported by substantial evidence. See Allen v. Sullivan, 977 F.2d 385, 389-90 (7th Cir. 1992) (concluding that, where plaintiff could not walk or stand for extended periods, ALJ erred in finding that he had the capacity to perform the full range of light work, because "the ability to stand or walk for six hours out of an eight-hour day would obviously seem to entail the capacity to walk and stand for 'extended periods'").

On remand, the ALJ shall, in accordance with his obligations, make specific findings of exactly what Plaintiff can and cannot do, especially with reference to his ability to walk, sit, and stand, and for how long. If the ALJ chooses to reject any aspects of the pain-based limitations Plaintiff asserts, he must provide sufficient grounds for doing so.

      5.    The ALJ Failed to Properly Assess the Effects of Plaintiff's Non-exertional Impairments

The record contains undisputed reports that Plaintiff suffered from carpal tunnel syndrome ("CTS"),[13] as well as Dupuytren's contracture[14] in his left hand. (R. 77, 87, 136-7, 143, 147, 249.) The ALJ acknowledged these reports, and even found Plaintiff's CTS to be a "severe impairment[]." (R. 17.) Yet he concluded that Plaintiff could perform the requirements of light and sedentary work, without ever evaluating the effects of Plaintiff's CTS and Dupuytren's contracture on his functional capacity.

A claimant's limited ability to engage in "handling,[15] fingering,[16] and feeling" is a non-exertional impairment.[17] See S.S.R. 85-15, 1985 WL 56857 (1985). The regulations require an ALJ to consider all of a claimant's non-exertional impairments, and to determine the extent to which those impairments limit the claimant's ability to perform the full range of work of a given exertional category.

Handling is "required in almost all jobs. Significant limitations of . . . handling, therefore, may eliminate a large number of occupations a person could otherwise do." Id. at *7. Similarly, "[a]s a general rule, limitations of fine manual dexterity have great[] adjudicative

---

[13] Carpal tunnel syndrome is "a condition caused by compression of the median nerve in the carpal tunnel and characterized especially by weakness, pain, and disturbances of sensation in the hand and fingers." See Merriam-Webster's Medical Dictionary, Carpal Tunnel Syndrome, available at http://www.merriam-webster.com/medical/carpal%20tunnel%20syndrome (last visited Mar. 21, 2010).

[14] Dupuytren's contracture is a disorder in which "the palmar fascia—a fibrous membrane below the skin—becomes progressively contracted, making it difficult to extend one or more fingers." 8 Lee R. Russ et al, Attorneys Medical Advisor § 72:27 (2010).

[15] "Handling" involves "seizing, holding, grasping, turning or otherwise working primarily with the whole hand or hands." S.S.R. 85-15, 1985 WL 56857, at *7.

[16] "'Fingering' involves picking, pinching, or otherwise working primarily with the fingers. It is needed to perform most unskilled sedentary jobs . . . ." Id.

[17] Whereas "[a]n exertional limitation is a limitation or restriction . . . that affect[s] only a claimant's ability to meet the strength demands of jobs (i.e., sitting, standing, walking, lifting, carrying, pushing, and pulling)[,] [a] nonexertional limitation is one imposed by the claimant's impairments that affect[s his] ability to meet the requirements of jobs other than strength demands, and includes manipulative impairments and pain." Rosa v. Callahan, 168 F.3d 72, 78 n.2 (2d Cir. 1999) (internal citations and quotation marks omitted); 20 C.F.R. § 404.1569a(a), (c).

significance . . . as the person's exertional RFC decreases," because they significantly narrow the range of sedentary and light work available to a claimant. Id. Because manipulative limitations vary in degree, an ALJ may be required to obtain the assistance of a vocational expert to determine what work the claimant can still do and whether appropriate jobs exist in the national economy. Id. The Second Circuit requires such expert testimony "when a claimant's nonexertional impairments significantly diminish his ability . . . to perform the full range of employment indicated by the medical vocational guidelines." Bapp v. Bowen, 802 F.2d 601, 606 (2d Cir. 1986).

In this case, the ALJ summarily concluded that, based on Plaintiff's RFC "for sedentary to light work," Plaintiff was not disabled during the relevant period. Especially in light of the ALJ's finding that Plaintiff's CTS was a severe impairment, the ALJ's implicit conclusion – that Plaintiff's CTS and Dupuytren's contracture did not limit his capacity for fingering and handling, thus significantly diminishing the range of work he could perform – is not supported by substantial evidence. Dr. Wagman testified before the ALJ that the Dupuytren's contracture in Plaintiff's left hand would make "fine motion," such as writing, difficult for him, especially because he is left-handed. (R. 249-50, 252-53.) This would clearly limit the types of sedentary work Plaintiff could do. See Rosa v. Callahan, 168 F.3d 72, 82 (2d Cir. 1999) ("Most unskilled sedentary jobs require good use of the hands and fingers for repetitive finger actions. Rather than demonstrating [plaintiff]'s ability to meet these demands of sedentary employment, the record actually raises significant doubts as to [plaintiff]'s capacity to perform these activities.") (internal citations and quotation marks omitted).

Because "handling" is required for most jobs, and "fingering" for most sedentary jobs, the ALJ in this case had an obligation to consult an expert to determine the availability of jobs

for individuals incapable of frequently engaging in such activity. See Nigino v. Astrue, No. 04-CV-3207 (ENV), 2009 WL 840382, at *6 (E.D.N.Y. Mar 30, 2009) (holding that ALJ erred by failing to consider whether range of work claimant could perform was so significantly diminished by, inter alia, CTS, as to require the introduction of vocational testimony). Not only did the ALJ fail to contact an expert, he failed to list a single job that Plaintiff was capable of performing.

On remand, the ALJ must evaluate whether Plaintiff's non-exertional limitations significantly diminished his ability to perform light or sedentary work.[18] See, e.g., Pratts, 94 F.3d at 39. If the ALJ finds that they did, he must present the testimony of a vocational expert, or similar evidence, as to the existence of jobs in the national economy that plaintiff can obtain and perform notwithstanding his functional limitations. Rosa, 168 F.3d at 78,

### F.  Disposition

The ALJ failed to obtain or set forth medical evidence sufficient to support his determination that Plaintiff was not disabled during the relevant period. Because the present record is so deficient, however, this court cannot conclusively find that Plaintiff was disabled during the relevant period. "[W]here the ALJ failed to develop the record sufficiently to make appropriate disability determinations, a remand for further findings that would so plainly help to assure the proper disposition of the claim . . . is particularly appropriate." Butts v. Barnhart, 388 F.3d 377, 386 (2d Cir. 2004) ("Butts I") (internal quotation marks and brackets omitted).

However, because the ALJ here progressed to and completed step five of the five-step sequential analysis, the court may impose a time limit for the Commissioner to complete

---

[18] When performing this analysis, the ALJ must consider "the combined effect of [Plaintiff's] impairments," rather than each impairment in isolation. See Dixon v. Shalala, 54 F.3d 1019, 1031 (2d Cir. 1995) ("[T]he SSA must evaluate [the] combined impact [of impairments] on a claimant's ability to work, regardless of whether every impairment is severe.").

administrative proceedings on remand, including the issuance of a final decision. See Butts I, 388 F.3d at 387 (2d Cir. 2004), am. on reh'g, 416 F.3d 101 (2d Cir. 2005). In cases where the delay is particularly egregious and "remand for further evidentiary proceedings (and the possibility of further appeal) could result in substantial, additional delay," it is "imperative" that the district court impose a time-limit. Id. This case has taken years to make its way through the administrative process. Plaintiff filed the current application on July 14, 2003 – about seven years ago. Notably, it took more than five years for the Commissioner to reach a final decision on Plaintiff's current application for benefits after two rounds of administrative hearings and appeals. Under the circumstances, a court-ordered time limit is appropriate to avoid "hardship to [the] claimant [from] further delay." Butts I, 388 F.3d at 387.

A time limit is especially appropriate because in this case, as in Butts, the court is reviewing the ALJ's decision at step five of the disability determination. When an ALJ proceeds to step five of the sequential analysis, he has necessarily determined that the claimant suffers a severe impairment (step two), which renders him unable to perform his past work (step four). Once such inability to work is established, the claimant is relieved of his burden; he need prove nothing more to establish disability. He thus holds a presumption of disability unless and until the Commissioner at step five proves that there are in fact jobs that the claimant is capable of performing, despite his established limitations. See id. at 104.

Because the ALJ conceded that Plaintiff had limited capacity to work, but did not satisfy his burden of proving that Plaintiff's limitations did not preclude him from working altogether, the ALJ's decision, as it stands, "would compel a finding that [Plaintiff] was disabled absent the Commissioner's meeting [his] burden of making a contrary showing." Id. at 104. On the present record, therefore – even with its deficiencies – the court finds that Plaintiff "has made his

showing of disability, and the Commissioner has failed to meet [his] burden of rebuttal." Id. Absent such a rebuttal, Plaintiff is entitled to benefits as a matter of law. Therefore, if the court-ordered deadlines for the completion of administrative proceedings are not observed, a calculation of any and all benefits owed to Plaintiff must be made immediately. Id. at 106.

Accordingly, to ensure that remand here does not result in additional undue delay, the court directs the Commissioner to complete all further administrative proceedings within 120 days of the issuance of this order. So long as Plaintiff is prepared to go forward with his case within the first thirty (30) days of that period, proceedings before an ALJ must be completed within 120 days of the issuance of this order. See Butts II, 416 F.3d at 106. If Plaintiff is not prepared to go forward within the first thirty (30) days, the proceedings must be completed within ninety (90) days from the date he is prepared. If, upon remand, the ALJ denies Plaintiff's claim, the Commissioner is directed to issue a final decision within sixty (60) days of any appeal from that denial. If the above deadlines are not observed, a calculation of benefits owed Plaintiff must be made immediately.

## III.    CONCLUSION

As described above, the court finds that the ALJ failed to (1) develop the record; (2) obtain the opinions of Plaintiff's treating physicians; (3) provide an adequate RFC assessment; (4) state sufficient reasons for his conclusions; (5) support his findings with substantial evidence; (6) consider all of Plaintiff's impairments; (7) properly consider Plaintiff's subjective complaints of pain; (8) produce the testimony of a vocational expert; (9) offer instances of work Plaintiff could have performed. For all these reasons, Plaintiff's motion is GRANTED in part and the case is remanded for further proceedings.

On remand, the Commisioner shall take the following actions:

(1) Fully develop the record with medical evidence from the relevant period, including from Dr. Tenet and Dr. Asters. If medical records from the relevant period are unavailable, the ALJ shall obtain retrospective diagnoses from Plaintiff's treating physicians. See Byam, 336 F.3d at 183; Rivera, 923 F.2d at 964.

(2) Obtain proper expert medical opinion as to Plaintiff's RFC during the relevant period.

(3) Hold a new hearing at which the ALJ shall explore the specific nature of Plaintiff's subjective complaints and limitations during the relevant period. The ALJ shall call a vocational expert to testify to the availability of jobs in the national economy for an individual suffering from the combined limitations and impairments experienced by Plaintiff, including non-exertional impairments. See 42 U.S.C. § 423(d)(2)(B); Dixon, 54 F.3d at 1031.

(4) Render, within 120 days of this Order, a decision setting forth with particularity all findings required by the regulations, and explaining how evidence in the record substantially supports those findings.

SO ORDERED.

s/Nicholas G. Garaufis

Dated: Brooklyn, New York
      July _15_, 2010

NICHOLAS G. GARAUFIS
United States District Judge